UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF OHIO
WESTERN DIVISION

| | | |
|---|---|---|
| WILLIAM O. CASS, JR., Administrator | : | Case No. 3:12-cv-248 |
| | : | |
| Plaintiff, | : | Judge Timothy S. Black |
| | : | |
| vs. | : | |
| | : | |
| CITY OF DAYTON, *et al.*, | : | |
| | : | |
| Defendants. | : | |

**DECISION AND ENTRY GRANTING DEFENDANTS' MOTION
FOR SUMMARY JUDGMENT (Doc. 16) AND DENYING AS MOOT
DEFENDANTS' MOTION TO BIFURCATE TRIAL (Doc. 17)**

This case is before the Court on Defendants' Motion for Summary Judgment.

(Doc. 16). Plaintiff filed a Response to Defendants' Motion. (Doc. 19). Thereafter,

Defendants filed a Reply Memorandum in Support of their Motion. (Doc. 22).

Defendants' Motion for Summary Judgment is now ripe for decision by the Court.

This case involves claims asserted by Plaintiff William O. Cass, Jr. ("Plaintiff"),

Administrator of the Estate of Derrick Jordan ("Jordan"). Jordan was shot to death by

Defendant Detective David House ("Detective House") of the Dayton Police Department

while Jordan was a passenger in a vehicle fleeing from law enforcement officers in the

parking lot of an Econo Lodge Motel located on Edwin C. Moses Blvd in Dayton, Ohio.

Plaintiff asserts claims under 42 U.S.C. § 1983, alleging that Defendants violated his

rights under the Fourth Amendment. Plaintiff also asserts a claim of wrongful death

under Ohio law. Defendants now move for summary judgment on all claims.

# I. FACTS[1]

On May 16, 2008 Detective James Mullins of the Dayton Police Department Special Investigations Division Drug Unit set up a buy-bust operation with information received from a confidential informant, who ordered an ounce of crack cocaine from convicted drug trafficker Robert Aaron Moore ("Moore").  Detective Mullins was familiar with Moore because he previously arrested Moore for drug trafficking and possession of five grams of crack in January 2007.

At approximately 1823 hours on May 16, 2008, Detective Mullins assembled a team to brief on the buy-bust operation of Moore.  The following team members were present for the briefing: Sergeant Mark Spiers, Sergeant Brian Johns, Detective David House, Detective Keith Coberly, Detective Dennis Murphy, Detective Doug Hall, Detective Joe St. Clair, Detective Tommy Harshman, Officer Mark Ponichtera, Officer Ron Velez, and Officer Tom Oney.  Detective Mullins advised the team that the confidential informant had multiple conversations with Moore and had ordered an ounce of crack cocaine from Moore.  Detective Mullins advised the team that Moore was a known drug dealer, and was known to be armed with a gun.

Detective Mullins briefed the officers on two parts of the buy-bust operation.  The first part of the operation called for officers to conduct surveillance on a location where

---

[1] Pursuant to the Standing Order of the Court, Defendants filed a Statement of Proposed Undisputed Facts.  (Doc. 18).  Plaintiff responded to the Defendant's Statement of Proposed Undisputed Facts. (Doc. 21).  The statement of facts in this Decision and Entry largely incorporates the facts deemed undisputed by the parties in Docs. 18 and 21.

officers believed Moore was staying on Oberon Court in Dayton.  The first part of the buy-bust plan called for officers to simply make a traffic stop to arrest Moore and recover the crack near the Oberon Court address.  Because Moore was not near Oberon Court at the time of the operation, officers turned their attention to the second part of the operation, which involved Detective Mullins taking the informant to the Econo Lodge on Edwin C. Moses Blvd. to make the purchase from Moore.

Detective House arrived at the Econo Lodge at approximately 7:15 p.m. driving an unmarked City of Dayton vehicle.  Detective House knew the transaction was to take place underneath the overhang in front of the lobby doors of the Econo Lodge, and he surveyed the surrounding area.  Detective House originally took a position in the parking lot to the west of the McDonalds so he could look out his driver's side window and observe the Econo Lot parking lot and the front lobby area.  However, because there was light rain and mist, he decided to move a bit closer for a better view.  Detective House observed that Detective St. Clair, with Sergeant Brian Johns as his passenger, had parked on the east side of the McDonalds where both had a clear view of the Econo Lodge's front lobby area.

Eventually, Detective House moved his vehicle to a parking spot near the McDonald's drive-through where he was able to see the confidential informant.  Detective Mullins informed the team that Moore would likely arrive in a blue Ford Taurus.  Approximately one or two minutes after Detective House parked at the spot near the drive-through, information came from Detective Mullins, via radio, that Moore would

arrive at the Econo Lodge shortly. Within a minute or two, Detective House heard Detective Knight indicate, via radio, that a blue Ford Taurus was in a nearby, adjoining lot and that there were three to four occupants in the Taurus. Detective House then observed a blue Taurus drive westbound toward the Econo Lodge, eventually pulling into the parking lot of the Econo Lodge, directly underneath the overhang with the driver's side door closest to the entry doors of the Econo Lodge.

The blue Taurus stopped and the informant leaned down slightly to talk to the occupants of the Taurus through the windows of the vehicle. The informant then secretly signaled to officers that Moore was in the vehicle. Detective House witnessed the informant make the previously determined signal and Detective St. Clair relayed the information to the other detectives and officers who did not have a line of sight, advising them that the vehicle had arrived, that it was underneath the overhang meeting with the informant, and that the informant had signaled to advise of Moore's presence.

Once Detective St. Clair radioed that the signal was given, Detective Mullins directed officers to move in and effect the arrest. Detective House traveled eastbound along an access drive connecting the McDonald's parking lot with the Econo Lodge parking lot. Detective House intended to drive underneath the overhang to block the Taurus. However, as soon as the informant turned to walk toward the hotel, the Taurus immediately pulled out from underneath the overhang and began traveling through the parking lot of the Econo Lodge and toward the access entrance of the McDonald's. The

4

Taurus pulled away slowly with no indication the occupants discovered the informant or the presence of the officers on the scene.

Seeing the Taurus moving, Detective House adjusted his plan and tried to maneuver his vehicle to attempt to block the exit from the Econo Lodge onto Edwin C. Moses Boulevard.  Detective House stopped his vehicle diagonally across from the exit and, after stopping his vehicle, exited the driver's side.  As he exited his vehicle, Detective House saw Detective St. Clair's vehicle coming from the McDonald's parking lot, also on the access drive connecting the McDonald's lot to the Econo Lodge lot.  At this point, the Taurus continued toward Detective House's vehicle and crept to a stop approximately thirty feet from the passenger side of Detective House's vehicle.

Detective House came around the back of his vehicle and began approaching the Taurus along the opposite side of his car on foot.  At this point, Detective House saw Detective St. Clair, with Sergeant Johns in the passenger seat, drive alongside of him to the right.  Detective St. Clair's vehicle came to a complete stop as Detective House came around the back of his vehicle and Detective House expected that other officers would immediately arrive behind him, as initially planned, to converge on the Taurus and to assist in securing the scene and effectuating arrests.

Detective House, wearing his DPD utility vest with five-inch grade reflective lettering stating "Police" and his DPD badge, walked toward the Taurus with his weapon drawn and pointed at the Taurus.  As he approached the stopped Taurus, Detective House yelled "Dayton Police—Stop the car!"  As Detective St. Clair stopped and exited his

vehicle, he also yelled "Dayton Police!" with his weapon pointed toward the vehicle.

Detective House, believing that the individuals inside the vehicle saw the officers converging, and believing that the occupants of the Taurus were going to comply with his commands, continued to close toward the front of the Taurus with the intent of making contact with the suspects and effectuating an arrest. However, when Detective House was approximately ten feet from the Taurus, the driver of the Taurus, later identified as Charles Stargell ("Stargell"), punched the gas pedal and accelerated.

According to Detective St. Clair, he was also closing in on the vehicle when he witnessed Stargell turn to the left in a hurry and accelerate. Detective House's initial response was to try to get out of the way of the Taurus, so he ran to the left, toward the passenger side of the Taurus. However, as the Taurus continued forward, Detective House realized he was not going to be able to clear the front of the Taurus without being struck. Accordingly, as the Taurus reached Detective House, he placed his hands onto the hood and jumped into the air to try to keep his body on top of the Taurus, as opposed to falling down and possibly going under the Taurus where he could have been very seriously injured or killed.

The Taurus ultimately struck Detective House in the right leg, after which he rolled onto the hood and then off to the passenger side of the Taurus. Although the Taurus struck Detective House, the Taurus continued accelerating forward. Detective House landed on his feet, but because the momentum of moving off the vehicle threw

him back a little bit, he had to take two steps to regain his balance.  At that point,
Detective House was probably inches from the Taurus.

Detective St. Clair could see Detective House in the air as the Taurus struck him.
At this point, the Taurus suddenly struck Detective St. Clair's hand causing a lot of pain
and causing his firearm to discharge into the left rear window of the Taurus.  Detective
House, who at the time Detective St. Clair's gun accidentally discharged was near the
passenger side window of the Taurus, heard the shot and immediately believed that
Detective St. Clair fired in self-defense.

Detective House specifically testified about his thought process in this regard,
stating that, the last time he saw Detective St. Clair before a shot was fired, Detective St.
Clair "was stopping his vehicle and . . . was behind [him]."  Further, because Detective
House assumed, based on his training and experience, "that Detective St. Clair would be
exiting his vehicle[,]" he believed that the fleeing vehicle, which "had already struck
[him], was continuing to accelerate in the direction [he] had last seen Detective St.
Clair[.]"  Accordingly, Detective House believed "that this vehicle was now barreling
toward Detective St. Clair and [that Detective St. Clair] was firing in self-defense."

Because the Taurus was accelerating toward the area where Detective House
believed Detective St. Clair was, Detective House raised his weapon and fired one shot in
an attempt to strike the driver to stop his vehicle.  Detective House also testified that,
based on the events he witnessed in the moments preceding the firing of his weapon, he
believed that if the Taurus would have made it out onto Edwin C. Moses Boulevard, that

7

the fleeing suspect was not going to stop until he got into an accident and possibly killed himself, and/or the other occupants of his vehicle, and/or innocent civilians.

The bullet fired by Detective House did not strike Stargell, the driver of the Taurus. Instead, the bullet fired by Detective House struck Jordan. According to Detective House, Jordan was not in his sight at the moment he fired.

After Detective House fired the single shot, the Taurus continued to flee across the McDonald's parking lot to the westernmost exit. As the vehicle fled westbound through the McDonald's parking lot, Detective House witnessed a silver colored object fly out of the front passenger side window, where Jordan was seated. The object was later discovered to be a handgun. The Taurus ultimately drove over a curb, into the McDonald's parking lot, and crashed into a tree and stopped. Other officers apprehended the individuals in the vehicle. Jordan later died as a result of the gunshot wound.

## II. STANDARD OF REVIEW

A motion for summary judgment should be granted if the evidence submitted to the Court demonstrates that there is no genuine issue as to any material fact and that the movant is entitled to summary judgment as a matter of law. Fed. R. Civ. P. 56; *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-248 (1986). "Summary judgment is only appropriate 'if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law.'" *Keweenaw Bay Indian*

8

*Comm. v. Rising*, 477 F.3d 881, 886 (6th Cir. 2007) (quoting Fed. R. Civ. P. 56(c)). "Weighing of the evidence or making credibility determinations are prohibited at summary judgment - rather, all facts must be viewed in the light most favorable to the non-moving party." *Id*.

Once "a motion for summary judgment is properly made and supported, an opposing party may not rely merely on allegations or denials in its own pleading[.]" *Viergutz v. Lucent Technologies, Inc.*, 375 Fed. Appx. 482, 485 (6th Cir. 2010) (citation omitted). Instead, the party opposing summary judgment "must - by affidavits or as otherwise provided in this rule - set out specific facts showing a genuine issue for trial." *Id*. (citation omitted). In fact, Fed. R. Civ. P. 56(c) states that "[a] party asserting that a fact . . . is genuinely disputed must support the assertion by . . . citing to particular parts of materials in the record . . . or . . . showing that the material cited do not establish the absence . . . of a genuine dispute[.]" Where "a party fails . . . to properly address another party's assertion of fact as required by Rule 56(c), the court may . . . consider the fact undisputed for purposes of the motion." Fed. R. Civ. P. 56(e)(2).

Finally, "there is no duty imposed upon the trial court to 'search the entire record to establish that it is bereft of a genuine issue of material fact.'" *Buarino v. Brookfield Twp. Trustees*, 980 F.2d 399, 404 (6th Cir. 1992) (citations omitted). Instead, "[i]t is the attorneys, not the judges, who have interviewed the witnesses and handled the physical exhibits; it is the attorneys, not the judges, who have been present at the depositions; and it is the attorneys, not the judges, who have a professional and

financial stake in case outcome." *Id.* at 406. In other words, "the free-ranging search for supporting facts is a task for which attorneys in the case are equipped and for which courts generally are not." *Id.*

## III. ANALYSIS

Defendants move for summary judgment on all of Plaintiff's claims setting forth a number of arguments, namely: (A) that Detective House's use of force was constitutionally reasonable, and, therefore, not in violation of Jordan's Fourth Amendment rights; (B) that, even assuming a Fourth Amendment violation occurred, Detective House is entitled to qualified immunity; (C) that the municipal constitutional liability claims must fail as a matter of law; (D) that state statutory immunity bars Plaintiff's state claims; and (E) that Plaintiff's request for punitive damages is contrary to law.

### A.

"To prevail on a § 1983 claim, a plaintiff must establish that a person acting under color of state law deprived the plaintiff of a right secured by the Constitution or laws of the United States." *Green v. Throckmorton*, 681 F.3d 853, 859-60 (6th Cir. 2012) (citing *Waters v. City of Morristown, Tenn.*, 242 F.3d 353 (6th Cir. 2001)); *see also Trapp v. Kimpel*, No. 3:13-cv-18, 2013 WL 4510570, *3 (S.D. Ohio Aug. 23, 2013). Here, there is no argument by Defendants that Detective House was acting under color of state law, and, therefore, the Court focuses its inquiry on whether Detective House's actions deprived Jordan of his rights under the Fourth Amendment.

Claims against police asserting the use of excessive force "should be analyzed under the Fourth Amendment and its 'reasonableness' standard." *Graham v. Connor*, 490 U.S. 386, 395 (1989); *see also Scott v. Clay Cnty., Tenn.*, 205 F.3d 867, 876 (6th Cir. 2000). Under the Fourth Amendment, an officer can constitutionally use deadly force against a fleeing felony suspect where use of such force "is necessary to prevent the escape and the officer has probable cause to believe that the suspect poses a significant threat of death or serious physical injury to the officer or others." *Tennessee v. Garner*, 471 U.S. 1, 3 (1985).

The Supreme Court has identified several factors to assist the trier of fact in determining whether the force used was reasonable: "the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively resisting or attempting to evade arrest by flight." *Graham*, 490 U.S. at 388. "The calculus of reasonableness must embody allowance for the fact that police officers are often forced to make split-second judgments – in circumstances that are tense, uncertain and rapidly evolving – about the amount of force that is necessary in a particular situation." *Id.* at 396-97. The *Graham* test presents factors for consideration; it is not, however, a rigid and exclusive three-part test. *Ciminillo v. Streicher*, 434 F.3d 466, 467 (6th Cir. 2006) (stating that the "*Graham* factors do not constitute an exhaustive list," and the ultimate question is whether seizure is justified under the totality of the circumstances presented).

Here, the crimes at issue were severe.  Even ignoring the fact that individuals in the vehicle where engaged in a heroin transaction, an inherently dangerous activity itself, Stargell, the driver of the Taurus, also assaulted two officers with the Taurus in an attempt to evade arrest by flight.  In fact, Plaintiff admits that, if not for evasive efforts by Detective House in placing his hands on the Taurus and jumping to lessen the impact of the car striking him, he ran the risk of falling down and possibly going under the vehicle where he could have been very seriously injured or killed.  (Doc. 18, PAGEID 196; Doc. 21, PAGEID 616).

The only plausible assertion to be made by Plaintiff in asserting the unreasonableness of Detective House's conduct is the assertion that the Taurus posed no immediate threat to the safety of officers or others.  Generally, "[w]here the officer has probable cause to believe that the suspect poses a threat of serious physical harm, either to the officer or to others, it is not constitutionally unreasonable to prevent escape by using deadly force."  *Scott*, 205 F.3d at 877 n.16 (citing *Garner*, 471 U.S. at 11).  The determination of whether probable cause existed to justify the use of deadly force requires consideration of the "facts and circumstances within the officer's knowledge" at the time.  *Id.*  (citation omitted).

Here, the undisputed material facts regarding the circumstances at the scene of the shooting would warrant any reasonable officer to conclude that the Taurus posed a serious risk of injury to others.  Significantly, the parties do not dispute that, as Detective House approached the Taurus, it accelerated from a stopped position toward him.  While

Plaintiff points to facts that Stargell may have turned the wheels of the Taurus to the left before accelerating, and thus, not moving "directly at" Detective House, there is no dispute that, as the Taurus accelerated closer to Detective House, even as he ran to his left, he was unable to avoid the vehicle striking him.  In fact, the parties do not dispute that the Taurus posed a serious risk injury or death to Detective House before he took evasive measure to lessen the impact with the vehicle.  (Doc. 18, PAGEID 196; Doc. 21, PAGEID 616).

In addition, at or about the moment Detective House landed on his feet after being struck by the Taurus, he heard a gunshot and immediately believed that Detective St. Clair, who Detective House believed was following behind him on foot, was firing in self-defense.  Plaintiff places significance on the fact that Detective House did not actually see Detective St. Clair in the path of the Taurus at the time he fired the shot. However, while Detective House did not actually see Detective St. Clair in the path of the Taurus, Detective House reasonably explained his belief that Detective St. Clair was in danger as follows:

> the last time I had seen Detective St. Clair [before hearing the shot], he was stopping his vehicle and was behind me.  I knew, based on what we were doing, that Detective St. Clair would be exiting his vehicle, and, again, the last time I saw Detective St. Clair, he was directly behind me.  The vehicle had already struck me, was continuing to accelerate in the direction I had last seen Detective St. Clair, and my belief was that this vehicle was now barreling toward Detective St. Clair and he was firing in self-defense.

(Doc. 24, PAGEID 667).

Plaintiff also places significance on the fact that Detective St. Clair was no longer in the Taurus's direct path at the exact moment Detective House fired.  However, the undisputed facts establish that only a second elapsed from the moment the Taurus struck Detective St. Clair and the moment Detective House fired.  (Doc. 20-1, PAGEID 271). In fact, Detective St. Clair testified that Detective House's shot was almost simultaneous to his unintentional discharge.  (*Id.*)  Further, aside from seeking to stop the driver from presenting a risk of serious injury or death to Detective St. Clair, it is undisputed that Detective House was also aware, based on his experience and knowledge of the specific operation, that other officers would be approaching the Taurus to assist in the arrest. (Doc. 24, PAGEID 670; Doc. 18, PAGEID 195, ¶ 57; Doc. 21, PAGEID 615, ¶57).

Accordingly, while the threat of injury to Detective House himself may have terminated once he landed safely on his feet to the passenger side of the Taurus, based on the circumstances known to Detective House at that time, such as the fact that Stargell displayed no reservations about placing his life at risk in order to escape the scene, his belief that Detective St. Clair was in the path of the vehicle, and his undisputed belief that other officers and detectives were closing in to assist in the arrest (Doc. 18, PAGEID 195; Doc. 21, PAGEID 615), he possessed probable cause to believe that threat to other officers still existed when he fired at the driver of the Taurus.  Thus, for the foregoing reasons, Detective House's use of deadly force was not objectively unreasonable under the circumstances, and, therefore, he did not violate Jordan's Fourth Amendment rights.

14

B.

Defendants also argue that, even assuming the Court could conclude that Detective House used excessive force in shooting Jordan while he was a passenger in a fleeing vehicle, the law in effect at the time of Detective House's use of force does not clearly establish that he violated Jordan's constitutional rights under the circumstances. Accordingly, Defendants argue that Detective House is entitled to the protections afforded by qualified immunity.

"Qualified immunity shields individual government officials from liability 'insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.'" *Hensley v. Gassman*, 693 F.3d 681, 687 (6th Cir. 2012) (citing *Harlow v. Fitzgerald*, 457 U.S. 800 (1982)). For purposes of qualified immunity, a law is clearly established where it "is clear in regard to the official's particular actions in the particular situation." *Id*. (citing *Long v. Norris*, 929 F.2d 1111 (6th Cir. 1991)). "'The contours of the right must be sufficiently clear that a reasonable official would understand that what he is doing' violates federal law." *Id*. (citing *Anderson v. Creighton*, 483 U.S. 635 (1987)). In that regard, "'pre-existing law must dictate, that is, truly compel (not just suggest or allow or raise a question about), the conclusion for every like-situated, reasonable government agent that what defendant is doing violates federal law in the circumstances.'" *Saylor v. Bd of Educ. Of Harlan Cnty, Ky.*, 118 F.3d 507, 515-16 (6th Cir. 1997) (quoting *Lassiter v. Alabama A&M Univ., Bd. of Trustees*, 28 F.3d 1146 (11th Cir. 1994)).

15

In arguing that Detective House is entitled to qualified immunity, Defendants cite and rely primarily on three cases, *Brosseau v. Haugen*, 543 U.S. 194 (2004), *Smith v. Freland*, 954 F.2d 343 (6th Cir. 1992), and *Scott v. Clay Cnty., Ky.*, 205 F.3d 867 (6th Cir. 2000). Defendants argue that these cases demonstrate that any constitutional violation was not clearly established when Detective House shot Jordan. Plaintiff, on the other hand, cites a number of Sixth Circuit cases finding issues of fact as to whether an officer's conduct in shooting into a fleeing amounted to a constitutional violation.

One of the cases cited by Plaintiff is the case of *Smith v. Cupp*, 430 F.3d 766 (6th Cir. 2005). In *Smith*, the Sixth Circuit concluded that summary judgment in favor of an officer was not appropriate where, when viewing the evidence in a light most favorable to plaintiff, the officer had no "cause to believe that [the fleeing suspect] posed an immediate risk of death or serious danger to" the officer, the officer's partner or any nearby citizens. *Id.* at 776. Officers sought the fleeing suspect only because he was making harassing phone calls. *Id.* In addition, the suspect "never displayed any violent tendencies, and the facts support[ed] a finding that a reasonable officer in [defendant's] position would not have perceived danger to anyone at the scene." *Id.*

Plaintiff also cites *Murray-Ruhl v. Passinault*, 246 F. App'x 338 (6th Cir. 2007) and *Rodriguez v. Passinault*, 637 F.3d 675 (6th Cir. 2011). In *Rodriguez*, the Sixth Circuit reversed a grant of summary judgment in favor of an officer where facts in the record could support a conclusion that the officer "emptied his weapon at the vehicle, reloaded it, and fired at [the fleeing suspect] perhaps as many as a dozen times even after

16

[the fleeing suspect's truck] had passed [the officer] and, thus, after [the officer] could reasonably believe that [the fleeing suspect's truck] imposed a threat to himself or . . . to his partner." *Rodriguez*, 637 F.3d at 688-89 (citing *Murray-Ruhl*, 246 F. App'x at 344. In those cases, it was the later shots by the officer that "proved to be fatal." *Id*.

In *Estate of Kirby v. Duva*, 530 F.3d 475 (6th Cir. 2008), the Sixth Circuit affirmed the district court's denial of an officer's motion for summary judgment because facts, viewed in a light most favorably to plaintiff, supported a theory that the purportedly fleeing suspect's vehicle never moved in a threatening manner and none of the officers on the scene were "ever in harm's way." *Id*. at 479. In fact, one witness stated that the fleeing suspect's vehicle "stopped moving before shooting broke out." *Id*. In addition, expert testimony presented by plaintiff established that the fleeing suspect "had not intended to, and indeed could not have, hurt any of the defendants." *Id*. at 480.

In *Hermiz v. City of Southfield*, 484 F. App'x 13 (6th Cir. 2012), the Sixth Circuit affirmed the denial of qualified immunity in favor of an officer on summary judgment where facts viewed in a light most favorable to plaintiff demonstrated that the officer fired at least one shot from the side of the purportedly fleeing suspect's car in the absence of any indication "of an ongoing threat[.]" *Id*. at 17. The decision in *Hermiz* makes no indication of any other officers or citizens near the location of the incident.

In perhaps the most factually analogous case cited by Plaintiff, *Sigley v. City of Parma Heights*, 437 F.3d 527 (6th Cir. 2006), the Sixth Circuit reversed summary judgment in favor of an officer where there remained a factual dispute as to whether the

fleeing suspect turned his car toward the officer or whether the officer was running behind [the fleeing suspect's] car, out of danger[.]"  In addition, the Sixth Circuit found a factual issue as to whether the officer possessed "probable cause to believe that [the fleeing suspect] posed a significant threat of death or serious physical injury to others." *Id*. at 536, 538.  Further, there were facts that, construed in favor of plaintiffs, suggested that the fleeing suspect "drove in a manner to avoid others on the scene in an attempt to flee."  *Id*. at 536, 538.

The circumstances presented here, however, are distinguishable from all of the foregoing cases cited by Plaintiff.  Significantly, no reasonable fact-finder could conclude that Stargell drove the Taurus in a manner to avoid persons on the scene.  The parties do not dispute that, as Detective House approached the Taurus, the Taurus accelerated from a stopped position so close to Detective House that he was unable to avoid the vehicle from striking him, even as he ran to his left.  If not for Detective House's evasive efforts to lessen the impact with the car, there is no dispute that he ran the risk of serious injury or death.  Further, after the Taurus struck Detective House, it is undisputed that it then struck Detective St. Clair causing an accidental discharge of his weapon.

This case is further distinguished from *Sigley* because

 it cannot be reasonably disputed that Detective House possessed probable cause to believe that the fleeing Taurus posed a significant threat to the safety of other officers involved in the buy-bust operation.  The facts establishing such probable cause include: Detective House's knowledge that the Taurus struck him; his belief that the Taurus was

accelerating toward Detective St. Clair; his belief that Detective St. Clair shot at the Taurus in self-defense; and his belief, based on his knowledge of the buy-bust operation and his experience as a police officer, that the other detectives and officers involved in the operation would be converging on the Taurus to effectuate an arrest.

Of all the cases cited by the parties, the Court finds the case of *Brosseau*, 543 U.S. 194 (2004), where the Supreme Court found that the officer was entitled to qualified immunity, most instructive and most similar to the circumstances presented in this case. There, the fleeing suspect ignored the shooting officer's commands to exit a vehicle. *Brosseau*, 543 U.S. at 196-97. The fleeing suspect also was undeterred by the officer shattering the driver's side window with her handgun and the officer striking the fleeing suspect with the barrel and butt of her handgun. *Id.* Instead, the fleeing suspect started the vehicle and, as it started moving, the officer fired a single shot striking the fleeing suspect in the back. *Id.* According to the officer, she shot because she feared for the safety officers in the immediate area and citizens occupying vehicles in the fleeing suspect's path. *Id.*

Here, there is no dispute that there were other detectives and officers aside from Detective House and Detective St. Clair involved in the drug-bust operation. Further, there is no dispute that Detective House expected all of those other detectives and officers to converge on the scene and exit their vehicles to assist in the arrest of Moore. There can be no material dispute that Stargell was intent on avoiding arrest and "would do almost anything to avoid capture[,]" *Brosseau*, 543 U.S. at 200, as evidenced by the

19

undisputed fact that Stargell struck two officers on the scene and, had it not been for evasive maneuvering, Detective House could have been seriously injured or killed.

Thus, based on the foregoing, the circumstances presented here cannot be legitimately distinguished from the circumstances in *Brosseau*, wherein the Supreme Court concluded that officer were entitled to qualified immunity. Accordingly, the Court concludes that the law does not clearly establish that Detective House's conduct was violative of the Constitution under the undisputed circumstances presented. Therefore, qualified immunity shields Detective House from suit even if the Court could conclude that his conduct was constitutionally deficient.

## C.

Defendants next contend that the City of Dayton and the Dayton Police Department ("DPD") are entitled to summary judgment on the § 1983 asserted against them alleging a failure to train officers. "A governmental entity may be held liable for constitutional violations only if those violations are the result of an official policy or custom." *Myers v. Delaware Cnty, Ohio*, No. 2:07-cv-844, 2008 WL 4862512, *11 (S.D. Ohio Nov. 7, 2008). Plaintiff cites to the DPD policy stating that "[a]n officer will not discharge firearms from or at a moving vehicle unless they reasonably believe that such an action is in defense of human life[,]" and argues that the DPD failure to discipline Detective House for the incident amounts to a ratification of Detective House's purportedly unconstitutional use of force.

20

To prevail on such a ratification theory, Plaintiff is required to prove "'(1) a clear and persistent pattern of illegal activity, (2) which the [entity] knew or should have known about, (3) yet remained deliberately indifferent about, and (4) that the ... custom was the cause of the' underlying constitutional violation." *Hayward v. Cleveland Clinic Found.*, 878 F.Supp.2d 860, 868 (N.D. Ohio 2012) (citing *Thomas v. City of Chattanooga*, 398 F.3d 426, 433 (6th Cir.2005). Here, Plaintiff points to no evidence that the DPD or the City of Dayton has a history of ignoring prior instances of unconstitutional conduct.

Instead, Plaintiff simply argues that the DPD and the City of Dayton "ratified and adopted [Detective] House's action" of shooting by failing to discipline him for the purported policy violation. As noted by Defendants, "an incomplete investigation *after* a constitutional violation has occurred cannot be the moving force behind an already-completed action." *Hayward*, 878 F.Supp.2d at 868 (citing *Black v. City of Memphis*, No. 98–6508, 215 F.3d 1325, 2000 WL 687683, at *3 (6th Cir. 2000); *Kies v. City of Lima*, 612 F.Supp.2d 888, 901 (N.D. Ohio 2009). Accordingly, Defendants are entitled to summary judgment on Plaintiff's negligent training cause of action.

## D.

Defendants next argue that they are entitled to immunity under Ohio Rev. Code Chapter 2744 on Plaintiff's state causes of action. Pursuant to Ohio Rev. Code § 2744.02(A)(1), "a political subdivision is not liable in damages in a civil action for injury, death, or loss to person or property allegedly caused by any act or omission of the

21

political subdivision or an employee of the political subdivision in connection with a governmental or proprietary function." This general grant of immunity to political subdivisions is subject to limited exceptions, none of which Plaintiff seeks to invoke in this case, and none of which the Court finds applicable. *See* Ohio Rev. Code § 2744.02(B). Accordingly, the Court grants summary judgment in favor of the DPD and the City of Dayton on Plaintiff's state law claims.

Plaintiff does, however, challenge whether Detective House is entitled to immunity. Pursuant to Ohio Rev. Code § 2744.03, "an employee [of a political subdivision] is immune from liability unless his actions were 'manifestly outside the scope of [his] employment,' or 'were with malicious purpose, in bad faith, or in a wanton or reckless manner.'" *Radvansky v. City of Olmsted Falls*, 395 F.3d 291, 315-16 (6th Cir. 2005). Based on the foregoing analysis concerning Plaintiff's Fourth Amendment claims, in which the Court concludes that Officer House's conduct was objectively reasonable under the circumstances, "it follows that [Plaintiff] has also failed to demonstrate that [Detective House] acted with 'malicious purpose, in bad faith, or in a wanton or reckless manner[.]'" *Burdine v. Sandusky Cnty., Ohio*, No. 12–3672, 2013 WL 1606906, *6-7 (6th Cir. Apr. 16, 2013) (quoting *Chappell v. City of Cleveland*, 585 F.3d 901 (6th Cir. 2009)).

E.

Finally, Defendants move for summary judgment on Plaintiff's request for punitive damages.  Having found summary judgment appropriate on all of Plaintiff's claims, the request for punitive damages must be and is dismissed as well.

## IV.  CONCLUSION

Based on all of the foregoing, there being no genuine dispute as to any material fact and Defendants being entitled to judgment as a matter of law, Defendant's Motion for Summary Judgment (Doc. 16) is **GRANTED**.  Defendants' Motion to Bifurcate Trial on the Individual Liability Claims and Municipal Liability Claims (Doc. 17) is **DENIED** as moot.  The Clerk shall enter judgment accordingly and terminate this case on the Court's docket.

**IT IS SO ORDERED.**


Date:  11/4/13                                       ___ */s/ Timothy S. Black*_____
                                                           Timothy S. Black
                                                           United States District Judge